IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

O CENTRO ESPÍRITA BENEFICENTE
UNIÃO DO VEGETAL (UDV-USA),
a New Mexico corporation, on its own behalf
and as representative of its members,
O CENTRO ESPÍRITA BENEFICENTE
UNIÃO DO VEGETAL, NUCLEO SANTA FE (UDV),
a New Mexico corporation, on its own behalf
as representative of its members,
THE AURORA FOUNDATION,
a Texas corporation,

   Plaintiffs,

v.             No. CV-12-105 MV/LFG

BOARD OF COUNTY COMMISSIONERS
OF SANTA FE COUNTY,

   Defendant.

**FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF,
DECLARATORY JUDGMENT, AND DAMAGES**

  1. Plaintiffs—which include a Christian church and its Santa Fe congregation—bring

this suit for injunctive relief, declaratory relief, damages, and attorneys' fees and costs against

Defendant Board of County Commissioners of Santa Fe County pursuant to the Religious Land

Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc to 2000cc-5; the Free

Exercise Clause and the Establishment Clause of the First Amendment to the United States

Constitution; the Equal Protection Clause of the Fourteenth Amendment; the Civil Rights Act, 42

U.S.C. §§ 1983 and 1988; the New Mexico Religious Freedom Restoration Act (NMRFRA),

NMSA 1978, §§ 28-22-1 to 28-22-5 (2000); and the New Mexico Tort Claims Act (NMTCA), §§ 41-4-1 to 41-4-27 (2009).   Plaintiffs' claims arise from Defendant's unlawful denial of Plaintiffs' application to build a permanent temple on property where Plaintiffs had held their religious ceremonies, in a temporary structure, for many years.

2.   As alleged in greater detail below, Defendant's denial does not rest on a neutral, principled application of the Santa Fe County's land use code to the facts.   Defendant's own staff and the County Development Review Committee concluded that the church's application satisfied all of the requirements of the County's land use code.   But Defendant denied the application because a group of people who live in the same area—some of whom are hostile to the church because of its religious beliefs and practices and some of whom simply do not want a church in their neighborhood—opposed the temple project.   This opposition led Defendant to apply its land use code to the church in a way that it had not applied it to other applicants, to impose requirements on the church that the code does not mandate, and, finally, to deny the church's application, even though the application met all requirements of Santa Fe County's land use code.

3.   Defendant's order denying the church's application includes findings that lack factual support and findings that contradict and reject the findings of Defendant's own consultants, staff members, and development review committee.   Defendant's inaccurate findings are harmful not only to the Santa Fe congregation but also to UDV congregations who might seek to build temples in places other than Santa Fe County.   In addition to prohibiting the

church from building on land that holds special religious significance to it, the order indicates that Defendant will not allow the church to build a temple anywhere in Santa Fe County.

4.   As alleged in greater detail below, Defendant's denial of the church's application violated Plaintiffs' right to freely exercise their religion, as secured by RLUIPA, the First Amendment, the Fourteenth Amendment, and NMRFRA.  Defendant's outright refusal to permit the construction of Plaintiffs' temple substantially burdens Plaintiffs' exercise of religion, and the burden is not the least restrictive means of furthering any compelling government interest.  In addition, Defendant applied its land use code in ways that unlawfully discriminated against the church.

5.   Plaintiffs seek (a) preliminary and permanent injunctive relief requiring Defendant to grant the church's application to build a temple at the proposed site; (b) such other injunctive relief as the Court deems appropriate; (c) a declaration that Plaintiffs' application for master plan rezoning satisfies all of the requirements of the land use code for community services facilities and should be approved; (d) an annulment of the order that Defendant entered to deny the church's application; (e) damages sufficient to compensate Plaintiffs for the harms they suffered as a result of Defendant's violations of Plaintiffs' constitutional and statutory rights; and (f) Plaintiffs' attorneys' fees and costs.

**Jurisdiction and Venue**

6. The Court may grant preliminary and permanent injunctive relief under Federal Rule of Civil Procedure 65 and federal common law. The Court may grant declaratory relief under Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

7. The Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331.

8. The Court has jurisdiction over Plaintiffs' state claims under 28 U.S.C. § 1367 because those claims are related to the federal claims and are part of a single case or controversy.

9. Venue is proper under 28 U.S.C. § 1391(b) because: (a) Defendant is a governmental entity located in this district; (b) a substantial part of the events or omissions giving rise to the claim occurred in this district; and (c) a substantial part of property that is the subject of this action is situated in this district.

**Parties**

10. Plaintiff O Centro Espírita Beneficente União do Vegetal (UDV-USA) is the national organization of the UDV church in the United States.  It is incorporated in New Mexico.  Its principal office is in the District of New Mexico.  The UDV-USA brings this action on its own behalf and as representative of its members.

11. Plaintiff O Centro Espírita Beneficente União do Vegetal, Nucleo Santa Fe (the UDV or the church) is a religious organization that is incorporated in New Mexico.  Its only office is in the District of New Mexico.  The UDV brings this action on its own behalf and as representative of its members.

12.   The Aurora Foundation is a private, not-for-profit corporation.  It is incorporated in Texas.  Its office is in the District of New Mexico.  On behalf of the UDV and the UDV-USA, the Aurora Foundation paid certain expenses that the church incurred in connection with its land use application.

13.   Defendant Board of County Commissioners of Santa Fe County is a governmental entity for purposes of the New Mexico Tort Claims Act.  Defendant is a person for purposes of 42 U.S.C. § 1983.  Defendant is the final policymaker for the County of Santa Fe.  At all times material to the allegations in the complaint, Defendant and its staff members were acting under color of state law, and Defendant's staff members were acting in the course and scope of their employment.

## Statement of Facts

### Background

14.   The UDV is a well-established, highly-structured Christian Spiritist religion that originated in Brazil in the 1950s and was formally established there on July 22, 1961.  In Brazil, the UDV has over 17,000 followers, is recognized by the Brazilian government as a legitimate and lawful religious organization with over 150 temples in all major cities in every state in Brazil, and is highly respected.   In recognition of the fiftieth anniversary of the church's founding, the UDV was honored in Brazil's national Congress and in more than thirty state legislative assemblies and city councils throughout Brazil.

15.   Central and essential to the UDV religion is the sincere, sacramental use of *hoasca,* a

5

tea made from two plants native to the Amazon River basin.  Plaintiffs import their sacrament from Brazil, after religious leaders (*mestres*) of the UDV prepare the sacrament during religious rituals held for that purpose.  The tea, which members of the UDV receive as communion during religious ceremonies, connects them to God.  Members of the UDV understand that use of the sacramental tea outside of the religious context is prohibited by church law.

16.   The sacramental tea has been found to contain a very small amount of naturally-occurring dimethyltryptamine (DMT), which appears on the list of Schedule I controlled substances.  21 U.S.C. § 812.  In 2002, after a lengthy evidentiary hearing, this Court held that the Religious Freedom Restoration Act protected the church's importation, possession, distribution, and use of its sacrament and preliminarily enjoined the federal government from interfering with the UDV's religious use of its sacrament.  *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236 (D.N.M. 2002).  The Court concluded that the federal government failed to demonstrate that the UDV's use of *hoasca* posed a risk of harm to the health of church members or a risk of illicit use outside the church.  The United States Court of Appeals for the Tenth Circuit affirmed. *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 342 F.3d 1170 (10th Cir. 2003); *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) (en banc).   The United States Supreme Court unanimously affirmed.  *Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006).  After the Supreme Court's decision, the UDV and the defendant federal agencies, which included the Drug Enforcement Administration and the Department of Justice, entered

into a settlement agreement that resolved the litigation.  The settlement agreement requires the Drug Enforcement Administration and the UDV to cooperate to ensure that Plaintiffs' sacrament is safely and securely imported, handled, stored, distributed to members in religious services, and, when necessary, disposed of.

17.  As a principle of its faith, the UDV preaches against the use of drugs and alcohol.

18.  The UDV church was formally established in the United States in the 1990s.  On September 20, 1992, one of the founding members of the UDV church in Brazil, Florencio Siqueira de Carvalho (Mestre Florencio), directed a UDV session in the Arroyo Hondo neighborhood of Santa Fe County.  Mestre Florencio was a close disciple of the founder of the UDV church, Jose Gabriel da Costa (Mestre Gabriel).  During the ceremony, Mestre Florencio foresaw that one day there would be a congregation (*nucleo*) of the UDV in Santa Fe.  This event holds great religious significance to the members of the UDV.

19.  From December 1992 to December 1993, the UDV conducted periodic religious sessions approximately once a month with a small group of people on land located at 5 Brass Horse Road in Santa Fe County, New Mexico.  The land is at the intersection of Arroyo Hondo Road and Brass Horse Road, near the entrance to the Arroyo Hondo neighborhood, less than a mile from the Old Las Vegas Highway and Interstate 25.

20.  On December 4, 1993, Mestre Florencio's foresight came true.  The highest spiritual authority of the UDV, Luiz Felipe Belmonte do Santos (Mestre Felipe), traveled from the church's international headquarters in Brazil to Santa Fe and, as part of a ceremony of the UDV,

delivered documents establishing the authority for the UDV community in the United States to hold regular services on the land at 5 Brass Horse Road. This was the first time the UDV church had conferred such authorization on any group of adherents outside of Brazil. Subsequently, the church began to hold the full calendar of its religious services on the land.

21. On May 21, 1996, Raimundo Monteiro de Souza, who was then the highest spiritual authority of the UDV, traveled from the church's international headquarters in Brazil to Santa Fe to formally and ceremonially confer the spiritual authority of the Representative Mestre on the *mestre* responsible for the religion in Santa Fe. This ceremony was held on the land at 5 Brass Horse Road. This was the first time this spiritual event, which is fundamentally important to UDV members, had been realized outside of Brazil.

22. Plaintiffs have held several hundred religious services on the land at 5 Brass Horse Road during the many years that they have used the land, which is owned by a member and official of the church. In addition to regular services, Plaintiffs have celebrated weddings, baptisms, and holidays on the land.

23. The religious use of the land at 5 Brass Horse Road—including the ceremonies involving founders of the UDV faith—gives the land special religious significance to the church and its members. No other piece of land in the United States has the same religious significance to the members of the UDV in this country.

The land use dispute

24.  In 2006, Plaintiffs temporarily stopped holding their religious ceremonies on the land at 5 Brass Horse Road because the *nucleo* had outgrown the yurt (a temporary structure) that the church had erected on the property.

25.  After the congregation became too large to continue to use the yurt, Plaintiffs conducted services in temporary locations in Santa Fe County.

26.  Since well before the UDV submitted its application, Plaintiffs have used a studio that is attached to a house as their temporary temple.

27.  Plaintiffs do not own the property they currently use as a temple.  The UDV's laws require each *nucleo* to work towards owning the land and building where it holds religious services.

28.  Plaintiffs' current, temporary temple has unfinished plywood floors and unfinished plaster walls.

29.  The heating, ventilation, and air conditioning system in Plaintiffs' current temple is inadequate.  On cold days, parishioners must use blankets to stay comfortable.  On hot days, the temple becomes uncomfortably hot.

30.  Plaintiffs' current temple lacks functional laundry facilities.  This requires parishioners to launder the church's blankets, dishtowels, tablecloths, and other linens at their homes.

31.  Plaintiffs' current temple is not large enough for the growing congregation.  For example, the space available for childcare during services is inadequate for the number of children and, as a result, some members have stopped bringing their children to services and incur significant childcare expenses.

32.  The well water at Plaintiffs' current temple is not potable.  As a result, church members must bring all drinking water to the temple from their homes.

33.  Plaintiffs' current temple is not equipped for people with disabilities or elderly people whose mobility is limited.  The interior steps and stairs make it difficult for elderly members to move within the temple.

34.  Plaintiffs' current temple is in an area that residents of the neighborhood frequently use for recreation, such as hiking.  Because there is no fence to mark the property line of the lot where Plaintiffs' temporary temple is located, neighbors sometimes trespass, occasionally disrupting religious services.

35. A member of the church owns the land at 5 Brass Horse Road and has executed a purchase agreement with the church.  Under the purchase agreement, the church will pay the owner of the land a nominal sum in exchange for the land, as long as the land is used as the site of a permanent UDV temple for the Santa Fe Nucleo.

36.  In 2009, when some of the residents of the Arroyo Hondo area learned about Plaintiffs' application for a land use permit to build a permanent temple to replace the temporary structure, opponents of the temple project began complaining to Defendant and its staff.

10

Although the opponents' complaints varied, they can be summarized as falling into two categories.

37.  The first category included the types of complaints often associated with "not in my back yard" (NIMBY) reactions:

      a. the temple would increase traffic;

      b. the temple would increase noise;

      c. the temple would harm the residential character of the neighborhood;

      d. the temple would cause light pollution; and

      e. the temple's night time services would disturb area residents.

These complaints are belied by the fact that the UDV had previously conducted its religious ceremonies at the location in question for fourteen years, and none of the residents of Arroyo Hondo had ever complained to Santa Fe County, the State of New Mexico, or the UDV itself about anything. The complaints that began in 2009 related temporally to the fact that the plaintiffs sought to build a church, not to the nature of their conduct, their use of *hoasca*, their numbers, the traffic they caused, or any noise or light from their services.

38.  The complaints in the second category were based on a lack of understanding of, and in some cases hostility toward, the UDV and its religious beliefs and practices.  The complaints included the following, among others:

      a. the participants would be "under the influence" when they drove their vehicles;

      b. the participants would be likely to fall off a nearby cliff;

c. the church was a threat to neighborhood children;

d. the church was engaged in "drug use";

e. the church's "drug use" was disrespectful toward the Native American peoples who had occupied the area centuries ago;

f. the church should not be approved because of its use of *hoasca*;

g. the church would bring in increased crime, including by tempting neighborhood teenagers to break into the temple to steal the church's sacrament;

h. the church engages in ritual drumming that will disturb the neighborhood;

i. the church's use of *hoasca* is physically harmful to its members and should not be tolerated;

j. the church's possession of *hoasca* may become a magnet for illegal drug trade;

k. the church will attract strangers who will pose a threat to the neighborhood; and

l. the church's use of *hoasca* will contaminate the ground water.

These complaints are fanciful or misinformed.  This Court, the United States Court of Appeals for the Tenth Circuit, and the United States Supreme Court addressed at length health and safety issues that the federal government had raised.  The courts concluded that the federal government had failed to demonstrate any significant health and safety concerns associated with UDV's possession and use of *hoasca* in its religious ceremonies.   The other allegations that the residents of Arroyo Hondo made were also unfounded.  The UDV does not engage in ritual drumming and never has.  The UDV has operated in the United States for twenty years, and it has existed and

held its services in Arroyo Hondo for approximately fourteen years.  There has never been an instance of diversion of the church's sacrament in Santa Fe County or anywhere else in the United States.  Nor has there ever been any "drug trade" or any sort of crime associated with the church, nor is the nature of UDV conducive to any sort of criminal activity, nor have any neighborhood children ever been harmed in any respect, nor has any participant suffered adverse health consequences or fallen off a cliff, nor, to UDV's knowledge, has it ever drawn strangers to the neighborhood.

39.   Before Plaintiffs submitted their application and throughout the application process, Plaintiffs made good faith efforts to address the legitimate concerns of the residents of Arroyo Hondo.  For example, Plaintiffs invited those with concerns about or interest in the project to a series of meetings with members of the UDV to discuss the proposed temple.  During the meetings, Plaintiffs offered to take certain measures to minimize the impact on the surrounding neighborhood, including low-level lighting, fencing, lowering the height of the roof, and changing the color of the building.

40.   On June 24, 2009, fifteen opponents of Plaintiffs' proposed temple sent a letter to Plaintiffs, copied to Defendant and one of its staff members, that indicated that the opponents objected to Plaintiffs building any type of temple on the land at 5 Brass Horse Road and that the opponents were unwilling to negotiate with Plaintiffs.

41.  On July 7, 2009, Plaintiffs submitted an application to the County of Santa Fe for

a permit to build a permanent temple on the land at 5 Brass Horse Road, which they had used for religious purposes for approximately fourteen years.

42.   When Plaintiffs submitted their application and throughout the application process, the Santa Fe Nucleo had no more than 80 parishioners, most of whom reside in Santa Fe County.

43.   Plaintiffs' application sought permission to construct a proposed temple that would accommodate the needs of approximately 100 parishioners.

44.   When Plaintiffs submitted their application and throughout the application process, the Santa Fe Nucleo did not have a permanent temple.

45.   The permanent UDV temple that Plaintiffs originally proposed included space for religious services, a nursery to be used during religious services and other church gatherings, a common room, a dining room, two kitchens, two bathrooms, storage space, a greenhouse, and a caretaker's residence.   Plaintiffs also sought permission to re-erect the yurt, which they intended to use for religious purposes and storage.

46.   Plaintiffs intended to hold approximately 66 services at the new temple each year. Plaintiffs hold their regular religious services at 8:00 p.m. on the first and third Saturdays of each month and on ten other fixed religious holidays during the year.   A local *mestre* may hold additional religious services, some of which occur during daytime hours, including up to six instructive services annually and a small number of services to commemorate special events such as members' weddings.

47.  Article III, Section 7 of the Santa Fe County Land Use Code classifies churches as a type of "community service facility."   Other examples of community service facilities are "governmental services such as police and fire stations, elementary and secondary day care centers, schools and community centers."   Article III, Section 7.

48.   When Plaintiffs submitted their application, the code included the following standards for community service facilities.  Section 7.1 stated:

> Community service facilities are allowed anywhere in the County, provided all requirements of the Code are met, if it is determined that:
> 7.1.1. The proposed facilities are necessary in order that community services may be provided for in the County; and
> 7.1.2 The use is compatible with existing development in the area and is compatible with development permitted under the Code.

Section 7.2 stated, "The submittals and reviews for community service facilities shall be those provided for in Article III, Section 4.5."  When Plaintiffs submitted their application, the code did not include "Article III, Section 4.5," which had been deleted years earlier.

49.   Plaintiffs' application satisfied all code requirements for churches and other community service facilities.

50.   Although Plaintiffs' application satisfied all applicable provisions of the code, Defendant imposed additional requirements on Plaintiffs that did not apply to churches and other community service facilities.  Defendant also imposed requirements that it had not imposed on other churches and other community service facilities.

51.  For example, the code—which allowed community service facilities "anywhere in the County"—did not require an applicant for a permit to build a community service facility to

undergo a master plan (rezoning) process, but Defendant's staff informed Plaintiffs that they must do so.

52.  The master plan process, as Defendant's staff interpreted it, includes a number of additional submittal requirements that increased Plaintiffs' expenses.  Moreover, in the master plan process, final approval authority lay with Defendant—which is elected and political—and not with the County Development Review Committee (CDRC), which is appointed and whose members have land use expertise.

53.  Plaintiffs revised their application accordingly but submitted it under protest against the additional requirements Defendant chose to impose on them.

54.  On August 21, 2009, Defendant's Water Resource Specialist informed Plaintiffs that their application was complete with respect to water use and the availability of water to serve the proposed temple.

55.  Defendant's staff placed Plaintiffs' application on the agenda for the October 15, 2009, meeting of the CDRC.

56.  On October 13, 2009—just two days before the CDRC was scheduled to consider Plaintiffs' application—Defendant's staff withdrew Plaintiffs' application from the agenda for the CDRC's October 15, 2009, meeting.  Defendant's staff stated that the application was withdrawn from the agenda because "the determination that the application was complete was improvidently made." Defendant's staff, who had previously determined that Plaintiffs'

application was complete, stated that further code compliance review was necessary because Plaintiffs had submitted additional information.

57.   On October 15, 2009, Defendant's staff informed Plaintiffs that their application lacked an archeology survey and report.   The land use code does not require an archeology survey and report for developments of fewer than five acres, and Plaintiffs proposed to build their temple on a lot smaller than five acres.

58.   On December 1, 2009, Defendant's counsel sent Plaintiffs a letter regarding the status of their application and the need for additional information in order to move forward to a hearing before the CDRC.   Defendant's counsel explained, among other things, that Defendant's staff had "received voluminous correspondence and public comment regarding the UDV application."   Defendant's staff projected that Plaintiffs' application would be placed on the agenda for a CDRC meeting in early 2010.

59.   Enclosed with the December 1, 2009, letter from Defendant's counsel was a letter from Defendant's staff.   The letter from Defendant's staff informed Plaintiffs that Defendant's position with respect to water use and availability had changed since August 29, 2009, when Defendant's Water Resource Specialist had deemed the application complete with respect to water use and availability.   Sometime after August 29, 2009, Defendant's staff hydrologist had decided that Plaintiffs' application was incomplete.   Defendant's staff hydrologist's direct supervisor is an owner of the engineering firm that opponents of Plaintiffs' project had hired.

17

60.   As a result of Defendant's change of position with respect to water use and availability, Plaintiffs modified their development plan by removing the caretaker's residence and greenhouse.   In addition, Plaintiffs eventually drilled a well and engaged a groundwater hydrologist to prove that adequate water was available for the proposed temple and thereby reasonably respond to Defendant's change of position.

61.   The December 1, 2009, letter also informed Plaintiffs that they would have to meet burdensome requirements that were inapplicable to churches and other community service facilities.   For example, citing provisions of the land use code that applied only to commercial and residential uses—not community service facilities—Defendant's staff required Plaintiffs to submit a liquid waste disposal plan.

62.   Under the version of the land use code that was in effect at the time Plaintiffs submitted their application and that had been in effect since 1996, Defendant had not required all other applicants for permits to build community service facilities to submit liquid waste disposal plans.

63.   In the December 1, 2009, letter, Defendant's counsel asked Plaintiffs whether they would "agree to obtain an insurance policy naming the County as an additional insured covering potential liability of the UDV Temple and Santa Fe County involving congregation members who consume *hoasca* tea at a service, operate a motor vehicle thereafter and then are involved in a motor vehicle accident[.]"   Defendant's counsel also asked whether Plaintiffs take away and lock up congregants' car keys before they participate in religious services and whether Plaintiffs

18

would allow an independent physician to observe religious services to ensure that Plaintiffs take adequate steps to prevent congregants from driving.

64.   Unlike people who drive under the influence of alcohol, who cause hundreds of accidents each year—including accidents that kill and injure people—church members who drive several hours after the conclusion of religious services do not pose any threat to public safety and have never caused a single accident.  Yet Defendant did not make any inquiries similar to those described above of applicants who sought permission to use land for establishments that serve alcoholic beverages.

65.   On December 3, 2009, Defendant entered into a contract to hire a lawyer, at $700 per hour, which is an hourly rate far in excess of the rates that the most experienced lawyers in New Mexico charge, to provide legal consultation about the implications of the Constitution, RFRA, and RLUIPA for Plaintiffs' application.  Defendant's choice of a legal consultant reflects its bias against Plaintiffs.   Defendant's legal consultant has a national reputation for aggressively opposing the right to free exercise of religion.  In addition to stridently criticizing RFRA and RLUIPA, she has attacked Congress for enacting these statutes, religious organizations for invoking them, and courts for applying them to protect religious freedom.

66.   On July 30, 2010, Defendant's counsel sent a letter to counsel for Plaintiffs identifying issues that Defendant's counsel perceived as outstanding.   Among other things, counsel for Defendant stated that "[t]he UDV's use of Schedule I drugs during religious ceremonies makes its land use application particularly challenging," and that "Santa Fe is having

to apply its land use laws to protect the public without the protective restraints of state and federal law."

67.   In the letter of July 30, 2010, Defendant's counsel stated that Plaintiffs are not "exempt from the local laws that are intended to protect the public from the dangers associated with intoxicating substances and impaired driving."   However, Plaintiffs' application to build a temple did not include a request to be exempted from any state or local laws regarding driving under the influence.

68.   In the letter of July 30, 2010, Defendant's counsel stated that Plaintiffs' "application will not be considered complete until a reasonable plan addressing public safety is received."   On information and belief, Defendant's counsel was well aware that this Court, a federal appeals court, and the Supreme Court of the United States had concluded—based on evidence adduced during a lengthy hearing regarding safety issues associated with the UDV's use of *hoasca*—that the United States Department of Justice and the United States Drug Enforcement Agency had failed to demonstrate any significant threat to health and safety.

69.   The land use code does not require an applicant who seeks permission to build a community service facility to submit a public safety plan.

70.   On information and belief, Defendant has not required any applicant who sought permission to build a community service facility, other than Plaintiffs, to submit a public safety plan.

71.    Defendant does not require bars, restaurants, or other establishments that sell alcoholic beverages to submit public safety plans in order to obtain or renew liquor licenses or to obtain land use approvals and permits.

72.  On September 14, 2010, counsel for Plaintiffs responded to the July 30, 2010, letter from counsel for Defendant.  Plaintiffs' letter addressed every issue that Defendant's counsel had identified and asked that the UDV's application be placed on the agenda for the next CDRC meeting.

73.  In October of 2010, over a year after Plaintiffs submitted their application, Defendant amended the provision of the Code (Article III, Section 7) that set out the requirements for churches and other community service facilities.  With the amendment, Defendant codified some of the ad hoc requirements it had chosen to impose on Plaintiffs when they first submitted their application.  Defendant added the following language to the list of requirements in Section 7.1.3: "A master plan and preliminary and final development plan for the proposed development are approved."   Defendant also amended Section 7.2 to read: "The submittals and reviews for community service facilities shall be those provided for in Article III, Section 4.4 and Article V, Section 5.2 (Master Plan Procedure) and Section 7 (Development Plan Requirements)."

74.    Defendant's amendment of the Santa Fe County Land Use Code had significant consequences for Plaintiffs' application.  At the time Plaintiffs submitted their application, the code allowed community service facilities, such as Plaintiffs' proposed temple, anywhere in Santa Fe County.  The amendment imposed a new rezoning requirement for community service

facilities.  In addition, at the time Plaintiffs submitted their application, the appointed members of the CDRC, who have expertise in land use issues, had final authority to approve an application for a community service facility.  The amendment shifted final approval authority to Defendant, a political body with elected members.

75.  On November 18, 2010, the CDRC considered Plaintiffs' application during a public meeting.

76.  During the CDRC meeting, Defendant's staff—which had spent over fifteen months analyzing Plaintiffs' application and the opponents' objections—recommended that the CDRC grant master plan zoning and preliminary development plan approval, with the final development plan to be approved administratively, by Defendant's staff.  Defendant's staff representative, Shelly Cobau, explained to the CDRC that the proposed use was compatible with existing development, that the application was comprehensive in establishing the scope of the project, that the application met all code requirements, and that the preliminary development plan conformed to the master plan.  Ms. Cobau also explained that Defendant's staff have "always considered churches as a compatible use in a residential area[.]"

77.  Opponents of Plaintiffs' application and their consultants presented objections to the CDRC.  The objections pertained to a variety of subjects, including anticipated water use and availability, the liquid waste system, and whether the proposed temple was consistent with surrounding development.  Some of the opponents made false and derogatory statements about Plaintiffs, their sacrament, and their religious practices.

78.  After considering the written submissions of and oral presentations by Plaintiffs and their opponents and the recommendations of Defendant's staff, the CDRC—which consists of appointed residents with expertise in land use issues—approved Plaintiffs' preliminary development plan and recommended that Defendant approve Plaintiffs' application for master plan rezoning.

79.  The opponents did not appeal the CDRC's approval of Plaintiffs' preliminary development plan.

80.  Defendant placed Plaintiffs' application on its agenda for February 8, 2011, rather than its agenda for January of 2011, because of the amount of materials that Defendant's members would need to review and consider and because the composition of the County Commission was changing.

81.  On February 3, 2011—just five days before Defendant was to consider Plaintiffs' application and after the deadline that Defendant's staff had set for submissions—counsel for the opponents of Plaintiffs' temple submitted over 150 pages of materials to Defendant in support of the opponents' objections.

82.  Plaintiffs, their counsel, and their experts worked many hours to prepare a response to the opponents' objections.

83.  On February 7, 2011—the day before Defendant was to consider Plaintiffs' application—a member of the UDV church looked at the calendar on Defendant's web site to find out what time Defendant planned to hold its meeting.  The calendar stated that Plaintiffs'

23

application was tabled.  Later that day, after an inquiry from Plaintiffs' counsel, a member of Defendant's staff confirmed that staff had decided to recommend that Defendant table Plaintiffs' application because of "the large volume of supplemental information" that it had received.

84.  By the time Plaintiffs received notice that Defendant was unlikely to consider their application on February 8, 2011, three experts that Plaintiffs had engaged to address the opponents' objections had already begun traveling to New Mexico from different parts of the country.  At the time Defendant's staff made the decision to recommend that Defendant table Plaintiffs' application, Defendant's staff was aware that Plaintiffs' expert witnesses were traveling to New Mexico to testify at the hearing.  Rescheduling the hearing at the last minute cost Plaintiffs thousands of dollars.

85.  At Defendant's February 8, 2011, meeting, Defendant tabled consideration of Plaintiffs' application.

86.  Defendant's staff then suggested that Plaintiffs drill a well and commission a geohydrologic report showing water availability.  The land use code did not require either a well or a geohydrologic report because Plaintiffs' water budget was less than .25 acre-feet per year.  Nevertheless, at considerable expense, Plaintiffs drilled a well and commissioned a study.  The results showed that even employing the opponents' water use projections, which were incorrect, available water was more than adequate to serve Plaintiffs' needs.

87.  Defendant did not consider Plaintiffs' application until June 14, 2011.

24

88. Defendant's June 14, 2011, meeting began with a report from Defendant's staff. Ms. Cobau delivered the report.

89. Ms. Cobau described Plaintiffs' application and the opposition to it. Ms. Cobau also explained that staff had investigated and analyzed the concerns of the opponents about a wide variety of issues, including compatibility with surrounding development, traffic, architectural standards, safety, water availability, water use, the proposed liquid waste system, storm water management, fire protection, landscaping, and archaeology.

90. Ms. Cobau informed Defendant that both its staff and the CRDC recommended approval subject to minor conditions because the application met all code requirements.

91. Ms. Cobau explained that "the proposed structure is necessary to provide the UDV with a permanent place of worship in a place that is highly valued by the church members."

92. Ms. Cobau also stated, "Because the recommendation is for approval, it is unnecessary to address the factors under RLUIPA[.]"

93. After hearing presentations by Plaintiffs and their opponents, Defendant voted to table the application until July 12, 2011.

94. On July 12, 2011, Defendant resumed the hearing regarding Plaintiffs' application and considered additional testimony.

95. At the end of the hearing, Defendant denied Plaintiffs' application by a vote of three to two. Commissioners Anaya, Holian, and Mayfield voted to deny the application. Commission Chair Vigil and Commissioner Stefanics voted to approve the application.

96.  On October 25, 2011—twenty-seven months after Plaintiffs submitted their application—Defendant entered a written order denying Plaintiff's application.  Defendant's denial order rests on factual findings that lack support in the record evidence; findings that are directly contrary to the conclusions of Defendant's own consultants, the conclusions of Defendant's own staff, and the recommendations of the CDRC; and findings on factual issues that the land use code did not require Plaintiffs or Defendant to address.

97.  Defendant found that Plaintiffs had "vastly understated the water budget necessary at .21 acre-feet per year," and that "[a] conservative estimate taking omitted factors into account leads to a water budget of .34 acre-feet, substantially higher than the .25 acre-feet per year threshold required by the code."  The record evidence did not support this finding.  By making this finding, Defendant rejected the work of its own consulting hydrologist, who estimated water use of .10 acre-feet per year.  Defendant's hydrologist's estimate is less than half of the land use code threshold of .25 acre-feet that triggers requirements for groundwater testing and modeling. Plaintiffs had performed such testing and modeling, even though the code did not require it. Defendant's finding is based on the opinions of a hydrologist that the opponents of the temple hired to testify against Plaintiffs.  The opponents' hydrologist's opinions are not based on accurate information about Plaintiffs' potential water use.

98.  Defendant found that Plaintiffs "did not avail [themselves] of any of the appropriate techniques for calculating water availability," and that "use of proper techniques would have set water availability at .09 acre-feet per year," which "is insufficient regardless of any water budget

that applicants propose."   The land use code does not require any water availability analysis unless the proposed water use is greater than .25 acre-feet per year.   Defendant's own hydrologist found that .35 acre-feet of water were available per year.   Defendant rejected its hydrologist's finding and instead adopted the finding of the opponents' hydrologist, who relied on a deeply flawed theoretical analysis.   Plaintiffs drilled a well to prove that there was adequate water for their proposed use and that the opponents' hydrologist was wrong.

99.   Defendant found that "[t]here exists a neurotoxic hazard from the Ayahuasca alkaloids present in Applicant's hoasca tea.   These toxins resist microbial breakdown and would survive passage through a septic tank.   This may have a negative effect on biological systems in the environment."   The record evidence did not support this finding.   In addition to being used to justify the denial of the Santa Fe Nucleo's application, this finding, if left uncorrected, could be used to justify the denial of land use applications by other UDV *nucleos*.   Defendant based this inaccurate finding on testimony of the opponents hired consultant, whose testimony had been discredited by both Plaintiffs' expert and Defendant's expert.   The alkaloid harmine is not a dangerous neurotoxin.    In addition, Defendant's own consultant testified that the active ingredients in *hoasca* would reach the UDV's septic system in such a low concentration that they would "pose no threat to the groundwater quality."   Defendant's consultant explained that the human body breaks down the active ingredients in *hoasca*, leaving less than one percent of the active ingredient in urine.   Defendant's consultant further explained that when this urine is mixed with other liquids in the septic system, the concentrations of active ingredients in the septic

27

system would be less than .02 percent of the concentration in *hoasca* itself.  Additional factors, including dilution of the active ingredients in the acquifer, means that there is no risk of contamination of anyone's drinking water.

100.   The land use code does not require an applicant who seeks permission to build a community service facility to show that it has an adequate waste water system.  Defendant's practice is to defer to the New Mexico Environment Department (NMED) with respect to the adequacy of waste water systems; NMED's issuance of a permit is customarily sufficient for Defendant.   NMED engineers, who had considered the opponents' concerns about *hoasca* contamination, issued a permit to Plaintiffs, but Defendant cited the supposed inadequacy of the waste water system as a basis for denying Plaintiffs' application.   Defendant found that Plaintiffs' "waste water system is greatly under designed and, even taking into account the County's recommendations, will contaminate the environment."   The record evidence did not support this finding, which, if left uncorrected, could be used to justify the denial of land use applications by other UDV *nucleos*.  In addition, Plaintiffs agreed to the additional measures that Defendant's staff had requested, including ultraviolet treatment of all waste water.

101.   Defendant found that the character of the Arroyo Hondo neighborhood is "quiet, residential, [and] agricultural," and that Plaintiffs' "religious use blended with intoxicating drug use is not residential, agricultural use."   In addition to being used to justify the denial of the Santa Fe Nucleo's application, this inaccurate finding, if left uncorrected, could be used to justify the denial of land use applications by other UDV *nucleos*.  Defendant has permitted a variety of

facilities for non-residential, non-agricultural uses in Arroyo Hondo and throughout the county, including in predominantly residential areas.  Defendant has approved facilities for religious use throughout the county, including in predominantly residential neighborhoods.  Some of the most recent examples are the Mission Viejo Christian Academy (a nondenominational Christian school), Santa Nino Regional Catholic School and Holy Family Praying Heart Portal (a Catholic meditation facility), and Santa Fe Southwest S.D.A. Adventist Church Texico Conference Association of Seventh Day Adventists.  The Mountain Cloud Zen Center (a Buddhist facility) is in a residential area that is close to Plaintiffs' proposed temple. Within two miles of Plaintiffs' proposed temple, Defendant has permitted twenty business and community service facilities. The Academy for the Love of Learning, another recently approved community service facility, is in a predominantly residential neighborhood that is very close to the site of the proposed UDV temple, and the structure is more than twice the size of the proposed UDV temple.

102.  Defendant found that denial of Plaintiffs' application was necessary to protect "residential neighbors" from "drug-impaired drivers."  The record evidence did not support this finding.  In addition being used to justify the denial of the Santa Fe Nucleo's application, this finding, if left uncorrected, could be used to justify the denial of land use applications by other UDV *nucleos*.  The evidence showed that there has never been an automobile accident associated in any way with the sacramental use of *hoasca* by UDV members during the eighteen years in which the UDV has conducted services in Santa Fe County.  By contrast, during a six-year period, driving under the influence of alcohol caused over 1,300 automobile accidents in Santa

Fe County, some of which resulted in deaths and serious injuries. Yet Defendant grants development permits to bars and other establishments that intend to sell alcoholic beverages to their customers, some of whom drive in residential neighborhoods, and Defendant has allowed other such establishments to continue to operate in Santa Fe County. Some of the establishments that Defendant allows to sell alcoholic beverages are near predominantly residential areas, including Arroyo Hondo.

103.  The factual findings that Defendant included in its denial order, including the findings described in the preceding paragraphs, are mere pretext for the denial of Plaintiffs' application. Defendant denied the application for improper reasons, including hostility to Plaintiffs because of their religious beliefs and practices and political considerations. When they explained the need for RLUIPA, its co-sponsors, Senators Orrin Hatch and Edward Kennedy, stated, "Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against . . . in the highly individualized and discretionary processes of land use regulation. . . . [O]ften, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan.'" 146 Cong. Rec. S774–01 (daily ed. July 27, 2000).

104.  Since 1981, when Santa Fe County enacted its first zoning ordinance, Defendant has approved 54 churches under the section of the land use code that sets out requirements for community service facilities.

105.   During the past twenty years, Defendant has only denied one church's application for approval of a community service facility: Plaintiffs' application.

106.   Defendant's order denying Plaintiffs' application indicated that Defendant will never allow Plaintiffs to build a temple of any kind on the land at 5 Brass Horse Road.   For example, Defendant found that Arroyo Hondo is a residential neighborhood, and that "there is a compelling interest in zoning the Applicant's use to a non-residential neighborhood."

107.   Defendant's order denying Plaintiffs' application indicated that Defendant will not allow Plaintiffs to build a temple of any kind anywhere in Santa Fe County.   For example, Defendant found, "There are a significant number of religious organizations that assert the need to use controlled substances as part of their worship.   Santa Fe has a compelling interest in not setting a precedent that transforms it into a mecca for drug use."   If left uncorrected, this inaccurate finding could be used to justify the denial of land use applications by other UDV *nucleos*.

108.   Plaintiffs have sustained significant damages as a direct result of Defendants' conduct, including, but not limited to:

a.  loss of their statutory and constitutional rights to freely exercise their religion;

b.  loss of the use of the land at 5 Brass Horse Road;

c.  unusual and unnecessary expenses and hardships resulting from the necessity of using rented, temporary space for their religious services; and

d.  excessive, unusual, and customarily unnecessary expenses, including, but not limited to, attorneys' fees and costs and expert witness fees and costs resulting from Defendants' discriminatory imposition of and novel enforcement of the Santa Fe County Land Use Code.

<u>Federal claims</u>

**Count One**

**RLUIPA: unjustified substantial burden on free exercise of religion,
in violation of 42 U.S.C. § 2000cc(a)**

109.  Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

110.  Defendant has imposed a substantial burden on the Plaintiffs' exercise of religion by implementing land use regulations under which Defendant makes—or has in place formal or informal procedures or practices that permit it to make—individualized assessments of the proposed uses of the land located at 5 Brass Horse Road. 42 U.S.C. § 2000cc(a)(2)(C).

111.  The substantial burden that Defendant has imposed on Plaintiffs affects or, if removed, would affect, commerce with foreign nations, among the several States, or with Indian tribes under 42 U.S.C. § 2000cc(a)(2)(B).   Prohibiting Plaintiffs from building their temple affects such commerce, and construction of the proposed temple would affect such commerce.

112.  Defendant's actions substantially burden Plaintiffs' sincere exercise of religion, as defined in RLUIPA, in many ways, including the following:

a. By denying Plaintiffs' application, Defendant has prevented Plaintiffs from building a permanent temple on land that holds special religious significance to them.  As one of the Defendant's staff members explained, "the proposed structure is necessary to provide the

32

UDV with a permanent place of worship in a place that is highly valued by the church members."

b. By denying Plaintiffs' application, Defendant prevented Plaintiffs from building a permanent temple that is adequate to meet the current needs of the Santa Fe Nucleo. The space that Plaintiffs currently rent at significant cost is inadequate in a variety of ways, and Defendant's order indicates that they will deny an application to build a permanent UDV temple anywhere in Santa Fe County.

c. Defendant unnecessarily delayed the processing of Plaintiffs' application to build their temple and unnecessarily increased the cost of the application process, including by imposing requirements on Plaintiffs that do not apply to churches and other community services facilities under the land use code.

d. By denying Plaintiffs' application to build their permanent temple on the land at 5 Brass Horse Road, Defendant prevented Plaintiffs from using land that is available to them at a nominal cost.

113. Defendant cannot satisfy 42 U.S.C. § 2000cc(a)(1)(A) because it cannot demonstrate that imposition of the substantial burden on Plaintiffs furthers any compelling governmental interest.

114. Defendant cannot satisfy 42 U.S.C. § 2000cc(a)(1)(B) because even if it could demonstrate that imposition of the substantial burden on Plaintiffs furthers a compelling interest,

33

it cannot demonstrate that imposition of the substantial burden on Plaintiffs is the least restrictive means of furthering any such interest.

115.    Because Defendant's conduct violates RLUIPA, Plaintiffs are entitled to appropriate relief, including damages, attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and injunctive relief.

116.   Plaintiffs are entitled to injunctive relief.   Plaintiffs have no adequate remedy at law. The balance of the equities weighs in favor of an injunction requiring Defendant to approve Plaintiffs' application.   Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under RLUIPA.

### Count Two

**RLUIPA: imposition and implementation of land use code on unequal terms,
in violation of 42 U.S.C. § 2000cc(b)(1)**

117.   Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

118. Defendant exercised its authority in a manner that treated Plaintiffs on less than equal terms with nonreligious assemblies and institutions, in violation of 42 U.S.C. § 2000cc(b)(1), in many ways, including:

a.   Defendant imposed requirements on Plaintiffs that Defendant did not impose on nonreligious assemblies and institutions, such as requiring Plaintiffs to submit a public safety plan based solely on their religious use of *hoasca* while not requiring nonreligious establishments that sell alcoholic beverages to submit public safety plans.

34

b.   Defendant stated that it denied Plaintiffs' application in part to protect "residential neighbors" from the risk purportedly posed by drivers who Defendant incorrectly concluded would be impaired because of their sacramental consumption of *hoasca*, yet Defendant permits nonreligious establishments to sell alcoholic beverages to people who drive in neighborhoods that are primarily residential and agricultural.

c. Defendant denied Plaintiffs' application in part because Defendant found that Plaintiffs' proposed use is not consistent with what Defendant describes as the residential, agricultural character of Arroyo Hondo, yet Defendant permits nonreligious uses that have similar impacts in Arroyo Hondo and in other areas that have similar characteristics.

119.   Because Defendant's conduct violates RLUIPA, Plaintiffs are entitled to appropriate relief, including damages, attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and injunctive relief.

120.   Plaintiffs are entitled to injunctive relief.   Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction requiring Defendant to approve Plaintiffs' application.   Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under RLUIPA.

**Count Three**

**RLUIPA: discrimination on the basis of religion,**
**in violation of 42 U.S.C. § 2000cc(b)(2)**

121.   Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

122.   Defendant imposed and implemented its land use regulations in a way that discriminated against Plaintiffs on the basis of their religion, in violation of 42 U.S.C. § 2000cc(b)(2).  Defendant has permitted other religious organizations to use land in a manner that would have impacts that are substantially similar to the impacts of Plaintiffs' proposed land use. Defendant has not imposed the same land use requirements on other religious organizations that Defendant has imposed on Plaintiffs.

123.   Because Defendant's conduct violates RLUIPA, Plaintiffs are entitled to appropriate relief, including damages, attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and injunctive relief.

124.   Plaintiffs are entitled to injunctive relief.  Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction requiring Defendant to approve Plaintiffs' application.   Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under RLUIPA.

### Count Four

**42 U.S.C. § 1983: substantial burden on free exercise of religion,
in violation of the First Amendment**

125.   Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

126.   The framers of the Constitution, recognizing free exercise of religion as an inalienable right, secured its protection in the First Amendment to the Constitution.  The Free Exercise Clause provides that Congress shall make no law "prohibiting the free exercise" of

religion.  This provision applies to Defendant through the Due Process Clause of the Fourteenth Amendment.

127.  In *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that a law that substantially burdens the exercise of religion need not be justified by a compelling governmental interest if the law is neutral and of general applicability.  However, if a law that substantially burdens the exercise of religion is either not neutral or not generally applicable, the government may only justify the burden on religious exercise by proving that the law is narrowly tailored to further a compelling governmental interest.

128.  Defendant's application of the land use code to Plaintiffs substantially burdened Plaintiffs' exercise of religion in a variety of ways, including by preventing them from building a temple on land that holds special religious significance to them and by requiring them to incur expense and suffer delay.

129.  Defendant's land use code is neither neutral nor generally applicable in fact for a variety of reasons, each of which is sufficient, standing alone, to warrant strict scrutiny under the First Amendment:

a.  Defendant's denial of Plaintiffs' application was based in part on hostility toward Plaintiffs' religious beliefs and practices, including its sacramental use of *hoasca*.  This improper motive for denying Plaintiffs' application manifested itself in a variety of ways, including Defendant's finding that Santa Fe County has a compelling interest in preventing the

county from becoming "a mecca for drug use."  In addition, among other things, Defendant targeted Plaintiffs by amending the Santa Fe County Land Use Code to give Defendant final authority over Plaintiffs' application—authority Defendant did not have at the time Plaintiffs filed their application and authority that Defendant ultimately used to unlawfully deny the application, even though it satisfied all requirements of the land use code.

b.   Defendant's denial of Plaintiffs' application was not based on a neutral, principled application of the land use code.  Instead, as described above, Defendant's denial was based on its selective enforcement of certain requirements on Plaintiffs, including some requirements found nowhere in the land use code.

c.   Defendant denied Plaintiffs' application in part because Defendant claimed that the proposed temple would harm Defendant's interests in a variety of ways, including by creating risks to public safety as a result of impaired drivers and by compromising what Defendant characterized as the purely residential and agricultural character of the neighborhood. However, Defendant permits other activities that pose a far more realistic threat of harm to the same government interests, including the operation of establishments that sell alcoholic beverages and the use of other structures for non-residential, non-agricultural purposes in and around residential areas.

130.   Defendant cannot demonstrate that it has a compelling interest in substantially burdening Plaintiffs' exercise of religion.

131.   Even if Defendant could demonstrate that it has a compelling interest in substantially burdening Plaintiffs' exercise of religion, Defendant cannot demonstrate that the burden is narrowly tailored to further any compelling government interest.

132.   Because Defendant's conduct violates Plaintiffs' First Amendment right to freely exercise their religion, Plaintiffs are entitled to damages, attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and injunctive relief.

133.   Plaintiffs are entitled to injunctive relief.   Plaintiffs have no adequate remedy at law.   The balance of the equities weighs in favor of an injunction requiring Defendant to approve Plaintiffs' application.   Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' First Amendment right to freely exercise their religion.

### Count Five

### 42 U.S.C. § 1983: disparate treatment of religions, in violation of the First Amendment and the Fourteenth Amendment

134.   Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

135.   Defendant has violated Plaintiffs' First Amendment and Fourteenth Amendment rights not to be discriminated against on the basis of their religious beliefs and affiliation. Defendant has permitted other religious organizations to use land in a manner that would have impacts that are substantially similar to the impacts of Plaintiffs' proposed land use.   Defendant has not imposed the same land use requirements on other religious organizations that Defendant has imposed on Plaintiffs.

136.  Because Defendants' conduct violates the Free Exercise Clause and Establishment Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, Plaintiffs are entitled to damages, attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and injunctive relief.

137.  Plaintiffs are entitled to injunctive relief.  Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction requiring Defendant to approve Plaintiffs' application.  Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under the First Amendment and Fourteenth Amendment.

<u>Claims under New Mexico law</u>

**Count Six**

**New Mexico Religious Freedom Restoration Act: substantial burden on religious exercise that is not the least restrictive means of furthering any compelling government interest, in violation of NMSA 1978, § 28-22-3 (2000)**

138.  Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

139.  The New Mexico Religious Freedom Restoration Act (NMRFRA) grants protection to the free exercise of religion "in addition to the protections granted by federal law and the state and federal constitutions."  NMSA 1978, § 28-22-5 (2000).

140.  Defendant, which is a government agency under § 28-22-2(B), restricted Plaintiffs' exercise of religion by denying Plaintiffs' application to build a temple in the manner described above.  NMSA 1978, §§ 28-22-2(A) & 28-22-3 (2000).

141.  Defendant's restriction on Plaintiffs' exercise of religion violates § 28-22-3 because Defendant cannot establish that the application of the restriction to Plaintiffs is essential to further any compelling government interest.

142.  Even if Defendant could establish that its restriction on Plaintiffs' exercise of religion were essential to further a compelling government interest, Defendant's restriction on Plaintiffs' exercise of religion violates § 28-22-3 because Defendant cannot establish that application of the restriction to Plaintiffs is the least restrictive means of furthering a compelling governmental interest.

143.  Plaintiffs are entitled to injunctive relief under § 28-22-4(A)(1).  Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction preventing Defendant from further restricting Plaintiffs' exercise of religion without lawful justification. Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under NMRFRA.

144.  Plaintiffs are entitled to compensatory damages under § 28-22-4(A)(2) and the NMTCA.

145.  Plaintiffs are entitled to reasonable attorneys' fees and costs under § 28-22-4(A)(2).

## Count Seven

**NMRFRA**: **restriction of religious exercise through and by application of a rule that is not of general applicability, in violation of § 28-22-3(A)**

146.  Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

41

147. NMRFRA grants protection to the free exercise of religion "in addition to the protections granted by federal law and the state and federal constitutions."  NMSA 1978, § 28-22-5 (2000).

148.  Defendant, which is a government agency under § 28-22-2(B), restricted Plaintiffs' exercise of religion by denying Plaintiffs' application to build a temple in the manner described above.  NMSA 1978, §§ 28-22-2(A) & 28-22-3 (2000).

149.  Defendant's restriction on Plaintiffs' exercise of religion is not in the form of a rule of general applicability for the following reasons, each of which is sufficient, standing alone, to constitute a violation of § 28-22-3(A):

a.   Defendant's denial of Plaintiffs' application was based in part on hostility toward Plaintiffs' religious beliefs and practices, including their sacramental use of *hoasca*.  This improper motive for denying Plaintiffs' application manifested itself in a variety of ways, including Defendant's finding that it had a compelling interest in preventing Santa Fe County from becoming "a mecca for drug use."

b.   Defendant's denial order was not based on an evenhanded application of the land use code.  Instead, as described above, Defendant's denial order was based on its selective enforcement of certain requirements on Plaintiffs, including some requirements found nowhere in the land use code.

c.   Defendant denied Plaintiffs' application in part because Defendant claimed that the proposed temple would harm Defendant's interests in a variety of ways, including by

42

creating risks to public safety as a result of impaired drivers and by compromising what Defendant characterized as the purely residential and agricultural character of the neighborhood. However, Defendant permits other activities that pose a far more realistic threat of harm to the same government interests, including the operation of establishments that sell alcoholic beverages and the use of other structures for non-residential, non-agricultural purposes in and around residential areas.

150.  Plaintiffs are entitled to injunctive relief under § 28-22-4(A)(1).  Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction preventing Defendant from further restricting Plaintiffs' exercise of religion without lawful justification. Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under NMRFRA.

151.   Plaintiffs are entitled to compensatory damages under § 28-22-4(A)(2) and the NMTCA.

152.  Plaintiffs are entitled to reasonable attorneys' fees and costs under § 28-22-4(A)(2).

## Count Eight

### NMRFRA: direct discrimination against religion and among religions, in violation of § 28-22-3(A)

153.  Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

154. NMRFRA grants protection to the free exercise of religion "in addition to the protections granted by federal law and the state and federal constitutions."  NMSA 1978, § 28-22-5 (2000).

155.  Defendant, which is a government agency under § 28-22-2(B), restricted Plaintiffs' exercise of religion by denying Plaintiffs' application to build a temple in the manner described above.  NMSA 1978, §§ 28-22-2(A) & 28-22-3 (2000).

156.  Defendant's restriction on Plaintiffs' exercise of religion violates § 28-22-3(A) because it directly discriminates against religion and among religions.

157.  As explained above, Defendant has imposed requirements on Plaintiffs that Defendant has not imposed on other applicants who have sought permits to build community service facilities, including churches and other structures planned for religious use.  In addition, Defendant has permitted religious organizations other than the UDV to use land for religious purposes even though the other organizations' uses have equal or greater impacts on primarily residential and agricultural areas.

158.  As explained above, Defendant has imposed requirements on Plaintiffs—who seek permission to build a temple in which to consume a sacrament that Defendant fears may cause people to become impaired and then drive—that it has not imposed on those who seek permission to serve alcoholic beverages, for non-religious purposes, to people who sometimes become impaired and then drive.

159.  Plaintiffs are entitled to injunctive relief under § 28-22-4(A)(1).  Plaintiffs have no adequate remedy at law.  The balance of the equities weighs in favor of an injunction preventing Defendant from further restricting Plaintiffs' exercise of religion without lawful justification.

Plaintiffs will suffer irreparable harm without injunctive relief, and injunctive relief is reasonably necessary to protect Plaintiffs' rights under NMRFRA.

160.   Plaintiffs are entitled to compensatory damages under § 28-22-4(A)(2) and the NMTCA.

161.   Plaintiffs are entitled to reasonable attorneys' fees and costs under § 28-22-4(A)(2).

**Count Nine**

**42 U.S.C. § 1983: the provisions of the Santa Fe County Land Use Code that govern the applications for permits to build churches constitute a prior restraint on the First Amendment right to free exercise of religion**

162.  Plaintiffs incorporate the preceding paragraphs as if stated fully herein.

163.  Article III, Section 7 of the Santa Fe County Land Use Code governs applications to build churches and other community service facilities.

164.   Section 7.1 of the code states that "community service facilities are allowed anywhere in the County, provided all requirements of the Code are met, if it is determined that:

7.1.1.  The proposed facilities are necessary in order that community services may be provided for in the County;

7.1.2 .  The use is compatible with existing development in the area and is compatible with development permitted under the Code;

7.1.3.  A master plan and preliminary and final development plan for the proposed development are approved.

45

165.   The code does not define the term "necessary" for purposes of Section 7.1.1 or indicate how to determine whether a proposed facility is necessary.

166.   The code does not define the phrase "compatible with existing development in the area and compatible with development permitted under the Code" or indicate how to determine whether a particular use is compatible with existing and permitted development.

167.   Section 7.2 of the Code states that "The submittals and reviews for community service facilities shall be those provided for in Article III, Section 4.4 and Article V, Section 5.2 (Master Plan Procedure) and Section 7 (Development Plan Requirements)."

168.   Article V, Section 5.2.4 gives the County Development and Review Committee and Board of County Commissioners the discretion to approve or deny a master plan based on the following criteria:

a.  Conformance to the County and Extraterritorial Plan;

b.  Suitability of the site to accommodate the proposed development;

c.  Suitability of the proposed uses and intensity of development at the location;

d.  Impact to schools, adjacent land or the County in general;

e.  Viability of proposed phases of the project to function as completed developments in the case that subsequent phases of the project are not approved or constructed;

f.   Conformance to applicable law and County ordinances in effect at the time of consideration, including required improvements and community facilities and design and/or construction standards.

46

169.   The code does not indicate how to determine whether a site, proposed uses, or intensity of development are suitable.

170.   The code does not indicate what sorts of impacts to schools, adjacent land, or the County in general might be acceptable and what sorts of impacts might be unacceptable.

171.   The criteria for evaluating applications for community service facilities such as Plaintiffs' church are not narrow, precise, and objective.

172.   A zoning ordinance that does not contain narrow, precise, and objective standards to limit a land use authority's discretion in determining whether an application to build a church should be granted constitutes an unconstitutional prior restraint on protected expression and religious exercise under the First Amendment.

173.   Together or separately, Sections 7.1 and 7.2 of Article III and Section 5.2.4 of Article V, as well as other applicable provisions of the code, unconstitutionally afford Defendant unbridled discretion in its review of applications to build churches and other community service facilities.

174.   Plaintiffs are entitled to compensatory damages under 42 U.S.C. § 1983.

175.   Plaintiffs are entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiffs seek:

1.   a permanent injunction requiring Defendant to promptly take all action necessary to

47

formally approve the application and to cooperate with all state agencies regarding additional inspections, certifications, approvals, and permits;

2.  a judgment declaring that the church's application for master plan rezoning is complete and should be approved and annulling Defendant's order denying the church's application;

3.  a judgment declaring that the provisions of the Santa Fe County Land Use Code governing applications for permits to build churches are invalid because they constitute a standardless licensing scheme and unconstitutional prior restraint on the First Amendment right to free exercise of religion;

4. damages in an amount sufficient to fully compensate Plaintiffs for the harms they have suffered as a result of Defendant's unlawful acts;

5. attorneys' fees and costs of litigation pursuant to 42 U.S.C. § 1988(a) and NMSA 1978, § 28-22-4(A)(2) (2000); and

6.  such further relief that the Court considers appropriate.

Respectfully submitted,

FREEDMAN BOYD HOLLANDER
GOLDBERG IVES & DUNCAN P.A.

/s/ Zachary A. Ives
NANCY HOLLANDER
JOHN W. BOYD
ZACHARY A. IVES
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel. 505.842.9960

48

Fax  505.842.0761
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2012, I filed the foregoing pleading electronically

through the CM/ECF system, which caused all counsel of record to be served by electronic

means, as more fully reflected on the notice of electronic filing.

s/ Zachary A. Ives
Zachary A. Ives